Slip Op. 21-11

# UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| CALCUTTA SEAFOODS PVT. LTD., BAY SEAFOOD PVT. LTD., AND ELQUE & CO., <br><br>             Plaintiffs, <br><br>    v. <br><br> UNITED STATES, <br><br>             Defendant, <br><br>     and <br><br> AD HOC SHRIMP TRADE ACTION COMMITTEE, <br><br>             Defendant-Intervenor. | Before: Gary S. Katzmann, Judge <br> Court No. 19-00201 |

## OPINION

[Plaintiffs' motion for judgment on the agency record is granted and Commerce's Final Results are remanded consistent with this opinion.]

Dated: February 3, 2021

Neil R. Ellis, Law Office of Neil Ellis PLLC, of Washington, DC, argued for plaintiffs. With him on the brief were Rajib Pal and Alexandra S. Mauever of Sidley Austin LLP, of Washington, DC.

Kara M. Westercamp, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for defendant. With her on the brief were Joseph H. Hunt, Assistant Attorney General, Jeanne E. Davidson, Director, and Patricia M. McCarthy, Assistant Director. Of Counsel Brandon J. Custard, Senior Attorney, Office of Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce. With them on the post argument submission was Jeffrey Bossert Clark, Acting Assistant Attorney General.

Zachary J. Walker, Picard Kentz & Rowe LLP, of Washington, DC, argued for defendant-intervenor. With him on the brief was Nathaniel Maandig Rickard.

       Katzmann, Judge: This case deals with the interpretation and application of a statute, the

extent to which thereunder small companies are entitled to additional assistance in antidumping

("AD") reviews or investigations, the process by which assistance can be triggered, and how the

U.S. Department of Commerce ("Commerce") should account for the difficulties those small

companies may encounter.  At issue is Commerce's AD review of duties on certain frozen warmwater shrimp from India.  <u>Certain Frozen Warmwater Shrimp From India: Final Results of Antidumping Duty Administrative Review; 2017–2018</u>, 84 Fed. Reg. 57,847 (Dep't Commerce Oct. 29, 2019) ("<u>Final Results</u>").  Plaintiffs Calcutta Seafoods Pvt. Ltd., Bay Seafood Pvt. Ltd., and Elque & Co. (collectively, "the Elque Group"), exporters of frozen warmwater shrimp from India, initiated this suit against Defendant the United States ("Government") to challenge the final results issued by Commerce in the thirteenth administrative review of the AD duty order covering certain frozen warmwater shrimp from India.  Pls.' Mot. For J. on the Agency R. at 2, Feb. 26, 2020, ECF No. 20 ("Pls.' Br.").  Commerce imposed an AD duty rate of 110.90% for Plaintiffs based on the application of facts available with adverse inferences ("AFA").  Mem. From J. Maeder to J. Kessler re: Issues and Decision Mem. for the Final Results of the 2017–2018 Antidumping Duty Administrative Review of Certain Frozen Warmwater Shrimp from India at 19 (Dep't Commerce Oct. 21, 2019), P.R. 188 ("IDM").

Plaintiffs challenge Commerce's imposition of this rate on the basis that: (1) Commerce did not provide adequate assistance to Plaintiffs as a small company subject to 19 U.S.C. § 1677m(c)(2); (2) Commerce improperly applied AFA neither supported by  substantial evidence nor in accordance with law as required by 19 U.S.C. § 1677e(b); and (3) even if Commerce properly applied AFA, the selected rate was unsupported by substantial evidence and was not otherwise in accordance with the law under 19 U.S.C. § 1677e(d).  Pls.' Br. at 2–4.  The Government and Defendant-Intervenor Ad Hoc Shrimp Trade Action Committee ("AHSTAC") ask the court to sustain Commerce's determination.  Def.'s Resp. to Pls.' Mot. For J. on the Agency R., May 1, 2020, ECF No. 24 ("Def.'s Br."); Def.-Inter. AHSTAC's Resp. to Pls.' Mot. For J. on Agency R., May 1, 2020, ECF No. 23 ("Def.-Inter.'s Br.").  The court holds that Commerce

unlawfully applied AFA to the Elque Group without providing it adequate assistance or considering its difficulties as a small company and remands to Commerce.

## BACKGROUND

### I.    *Legal Background*

Congress's AD statute empowers Commerce to impose remedial duties on imported goods when those goods are sold in the United States for less than their fair market value, and when the International Trade Commission determines that the domestic industry is thereby "materially injured, or . . . is threatened with material injury." See 19 U.S.C. § 1673(2)(A)(i)–(ii); Diamond Sawblades Mfrs. Coal. v. United States, 866 F.3d 1304, 1306 (Fed. Cir. 2017).    Dumping constitutes unfair competition because it permits foreign producers to undercut domestic companies by selling products below their fair market value.    Sioux Honey Ass'n v. Hartford Fire Ins. Co., 672 F.3d 1041, 1046 (Fed. Cir. 2012).    To address the harmful impact of such unfair competition, Congress enacted the Tariff Act of 1930, which empowers Commerce to investigate potential dumping and, if necessary, to issue orders instituting duties on subject merchandise.    Id. at 1047.    In these instances, "the amount of the [AD] duty is 'the amount by which the normal value exceeds the export price (or the constructed export price) for the merchandise.'"    Shandong Rongxin Imp. & Exp. Co. v. United States, 42 CIT __, __, 331 F. Supp. 3d 1390, 1394 (2018), aff'd, 779 F. App'x 744 (Fed. Cir. 2019) (quoting 19 U.S.C. § 1673).    Upon request, Commerce may conduct an administrative review of its AD duty determination and recalculate the applicable rate.    19 U.S.C. § 1675(a)(1)–(2); see Shandong Rongxin, 331 F. Supp. 3d at 1394.

In determining whether a good is being sold in the United States at less than fair value, Commerce may issue questionnaires to selected mandatory respondents[1] in order to gather information for its review.  See 19 U.S.C. § 1677f-1(c)(2)(A)–(B).  If Commerce deems a response to its request deficient, then Commerce "shall promptly inform the person submitting the response of the nature of the deficiency and shall, to the extent practicable, provide that person with an opportunity to remedy or explain the deficiency in light of the time limits established for the completion of investigations or reviews under this subtitle."  Id. § 1677m(d).  Commerce may provide this notice and the opportunity to remedy deficiencies through issuance of a supplemental questionnaire.

Additionally, 19 U.S.C. § 1677m(c) addresses the possibility that respondents may have difficulty fulfilling Commerce's requests for information during an investigation or review.  Under section 1677m(c)(1), upon prompt notification by a party, Commerce must consider the interested party's ability to provide the requested information and modify requirements to avoid imposing an unreasonable burden.  Id. § 1677m(c)(1).  Under section 1677m(c)(2), Commerce must consider

---

[1] In AD investigations or administrative reviews, Commerce may select mandatory respondents pursuant to 19 U.S.C. § 1677f-1(c)(2), which provides:

If it is not practicable to make individual weighted average dumping margin determinations under paragraph (1) because of the large number of exporters or producers involved in the investigation or review, the administering authority may determine the weighted average dumping margins for a reasonable number of exporters or producers by limiting its examination to--

(A) a sample of exporters, producers, or types of products that is statistically valid based on the information available to the administering authority at the time of selection, or

(B) exporters and producers accounting for the largest volume of the subject merchandise from the exporting country that can be reasonably examined.

difficulties experienced by parties, "particularly small companies," and "provide to such interested parties any assistance that is practicable in supplying such information." Id. § 1677m(c)(2).

Pursuant to 19 U.S.C. § 1677e, if a party fails to satisfactorily respond to Commerce's requests for "necessary information" to calculate a dumping margin by (1) withholding requested information, (2) failing to provide information by the submission deadlines or in the form or manner requested, (3) significantly impeding a proceeding, or (4) providing information that cannot be verified, Commerce shall use facts otherwise available to calculate the margin. Id. § 1677e(a)(1)–(2). Furthermore, Commerce may make a separate determination that the respondent failed to cooperate and apply AFA. Id. § 1677e(b)(1)(A). A respondent does not cooperate to the "best of its ability" when it fails to "put forth its maximum effort to provide Commerce with full and complete answers to all inquiries." Nippon Steel Corp. v. United States, 337 F.3d 1373, 1382 (2003). The Federal Circuit in Nippon Steel explained that Commerce must make an objective and subjective determination regarding respondent's efforts in assessing whether it acted to the best of its ability. Id. at 1382–83. The Federal Circuit clarified that this test applies "regardless of motivation or intent" on the part of the respondent, but that it "does not condone inattentiveness, carelessness, or inadequate record keeping." Id.

After making a finding that AFA is appropriate, Commerce may then select an AD rate using the adverse inferences against respondent. See 19 U.S.C. § 1677e(d)(2). The statute explicitly provides Commerce with the discretion to select among any dumping margins "under the applicable [AD] order," including "the highest such rate or margin." Id. § 1677e(d)(1)(B)–(2). However, in selecting an AFA rate, Commerce must "consider the totality of the circumstances in selecting an AFA rate, including, if relevant, the seriousness of the conduct of the uncooperative party." BMW of N. Am. LLC v. United States, 926 F.3d 1291, 1301–02 (Fed. Cir. 2019).

## II.    Factual Background

### A.    Administrative Review of the Elque Group

On April 16, 2018, Commerce published a notice of initiation regarding its administrative review of the AD duty order covering warmwater shrimp from India.  Initiation of Antidumping and Countervailing Duty Administrative Reviews, 83 Fed. Reg. 16,298, 16,300–04 (Dep't Commerce Apr. 16, 2018).  After first selecting two of the largest exporters who subsequently withdrew their review requests, and after receiving additional withdrawals from 234 other companies, Commerce selected Calcutta Seafoods and Magnum Sea Foods as mandatory respondents.  See Mem. from B. Bauer to M. Skinner, re: Selection of New Respondents for Individual Review (Aug. 7, 2018), P.R. 57.

Commerce issued an initial AD duty questionnaire to Calcutta Seafoods and Magnum Sea Foods.  Letter from Commerce to Calcutta Seafoods, re: Request for Information (Aug. 9, 2018), P.R. 59 ("Section D Questionnaire").  Based on Calcutta Seafoods' initial responses, Commerce collapsed Calcutta Seafoods, Bay Seafood, and Elque & Co. as one entity, the Elque Group, for the purpose of the administrative review.  Mem. from B. Bauer to M. Skinner, re: Whether to Collapse Bay Seafood Pvt. Ltd., Calcutta Seafoods Pvt. Ltd., and Elque & Co. in the 2017–2018 Antidumping Duty Administrative Review of Certain Frozen Warmwater Shrimp from India (Oct. 19, 2018), P.R. 108.  Relevant here, the Elque Group responded to Commerce's Section D Questionnaire and then replied to two supplemental questionnaires regarding Section D from Commerce.  Section D Questionnaire; Letter from Elque Group to Commerce, re: Elque Group Resp. to Section D Questionnaire (Nov. 13, 2018), P.R. 117 ("SDQ Resp."); Letter from Commerce to Elque Group, re: Administrative Review of the Antidumping Duty Order on Certain Frozen Warmwater Shrimp from India (Suppl. Section D Questionnaire) (Dec. 17, 2018), P.R. 122

("Suppl. SDQ1"); Resp. from Elque Group to Commerce, re: Submission of Suppl. Questionnaire Resp. Against Your Letter Dated Dec. 17, 2018 for Elque Group for Administrative Review of the Antidumping Duty on Frozen Warmwater Shrimp from India (Dec. 24, 2018), P.R. 138 ("Suppl. SDQ1 Resp."); Letter from Commerce to Elque Group, re: Administrative Review of the Antidumping Duty Order on Certain Frozen Warmwater Shrimp from India (Second Suppl. Section D Questionnaire) (Mar. 5, 2019), P.R. 142 ("Suppl. SDQ2"); Resp. from Elque Group to Commerce, re: Submission of Suppl. Questionnaire Resp. Against Your Letter Dated Mar.5, 2019 for Elque Group for Administrative Review of the Antidumping Duty on Frozen Warmwater Shrimp from India (Mar. 20, 2019), P.R. 150 ("Suppl. SDQ2 Resp.").  Commerce also granted the Elque Group various extensions throughout the review.  See, e.g., Letter from Commerce to the Elque Group, re: 2017–2018 Administrative Review of Certain Frozen Warmwater Shrimp from India: Grants Partial Extension for Section D Resp. (Nov. 6, 2018), P.R. 114; Letter from Commerce to the Elque Group, re: 2017–2018 Administrative Review of Certain Frozen Warmwater Shrimp from India: Grants Partial Extension for Second Section D Response (Mar.11, 2019), P.R. 144.

## B.    *Results of Commerce's Review*

On April 23, 2019, Commerce published preliminary results finding that the Elque Group had been a non-cooperative respondent.  Certain Frozen Warmwater Shrimp From India: Preliminary Results of Antidumping Duty Administrative Review; 2017–2018, 84 Fed. Reg. 16,843 (Dep't Commerce Apr. 23, 2019) ("Preliminary Results").  Commerce determined that the Elque Group failed, despite having multiple opportunities, to provide product-specific conversion costs and complete cost reconciliations that Commerce could rely on to calculate AD duty margins. Mem. from J. Maeder to G. Taverman, re: Decision Mem. for the Preliminary Results of the 2017–

2018 Administrative Review of the Antidumping Duty Order on Certain Frozen Warmwater Shrimp from India at 7–15 (Apr. 9, 2019), P.R. 59 ("PDM").  Commerce determined that the application of an adverse inference was justified because the Elque Group did not cooperate to the best of its ability and provided only vague answers to several questions.  Id. at 7–13.  As a result, Commerce assigned the Elque Group a 110.90% AD margin.  Preliminary Results at 16,844.  In May 2019, the Elque Group submitted case and rebuttal briefs regarding the Preliminary Results and specifically noted, in response to Commerce's preliminary application of AFA, their status as a small business, their efforts to cooperate and comply with Commerce's requests, and their timeliness in filing.  Case Br. of Elque Group at 1 (May 22, 2019), P.R. 170 ("Case Br.").

In its Final Results, Commerce maintained the application of AFA, stated that it considered the Elque Group's difficulties as a small business by providing extensions and supplemental questionnaires, and stated that the 110.90% AD margin was appropriate and in accordance with the law.  IDM at 11–19.  Commerce explained that the Elque Group's responses to the initial and supplemental questionnaires for Section D were insufficient because their answers were vague and did not provide product-specific costs.  Id. at 12.  Commerce outlined the most relevant physical characteristics that differentiate products, which make up a product's control number ("CONNUM"), and noted that shrimp has fourteen product characteristics.[2]  Id.  Commerce asked the Elque Group how its accounting system used recorded measures of date of purchase, species, form of purchase, basis of purchase, count sizes, quantities and rate for mix count size among other CONNUM-characteristics.  Id.  In response, the Elque Group submitted raw cost data indicating that it tracked some physical characteristics and that some products required more processing than

---

[2] The fourteen characteristics are: "cooked form, head status, count size, organic certification, shell status, vein status, tail status, other shrimp preparation, frozen form, flavoring, container weight, presentation, species, and preservative."  IDM at 12–13.

others.  Id. at 13–14.  However, Commerce stated that the Elque Group questionnaire responses did not explain how these CONNUM-specific metrics affected costs or price, nor did the Elque Group provide a CONNUM conversion to account for varied processing costs for the same physical products.  Id. at 14.  The Elque Group instead replied that "all physical characteristics were incorporated in its reporting methodology."  Id. at 12.  Without this CONNUM-specific information or conversion rates, Commerce concluded that it was not able to ensure that product-specific costs reflect the physical characteristics of a product and the variable costs associated with physical differences.  Id. at 16.  Commerce found that reported shrimp costs did not clearly or logically reflect differences in other CONNUM characteristics.  Id. at 13.  Commerce additionally found the replies deficient because of "numerous discrepancies" where the reported costs did not seem to correspond to the reconciliation of reported costs in each company's books and records. Id. at 14.  As a result, Commerce determined that it could not have confidence in the integrity of the Elque Group's responses, and thus applied AFA and assigned a 110.90% AD duty rate.  Id. at 15–16.

### C.  *Procedural History*

The Elque Group initiated the present litigation on November 20, 2019, challenging Commerce's Final Results as pertaining to the Elque Group.  Summons, ECF No. 1; Compl., ECF No. 4.  AHSTAC joined the litigation as Defendant-Intervenor on November 22, 2019.  Order Granting Mot. to Intervene as Def.-Inter., ECF No. 13.  On February 26, 2020, Plaintiff filed a revised Rule 56.2 motion for judgment on the agency record, arguing that Commerce did not provide the Elque Group with the requisite assistance they were entitled to as a small company and that Commerce's application of AFA was unsupported by substantial evidence and otherwise not in accordance with law.  Pls.' Br. at 2–4.  The Government and AHSTAC filed its response to

Plaintiff's motion on May 1, 2020.  Def.'s Br.; Def-Inter.'s Br.  Plaintiff filed a reply to the Government's opposition on May 22, 2020.  Reply of Pls. in Supp. of Mot. for J. on the Agency R., ECF No. 26 ("Pls.' Reply").  Oral argument was held on November 16, 2020.  Oral Arg., Nov. 16, 2020, ECF No. 42.  Prior to oral argument, the court issued and the parties responded to questions regarding the case.  Letter re: Questions for Oral Arg., Nov. 5, 2020, ECF No. 38; Resp. of Pls. to Questions for Oral Arg., Nov. 12, 2020, ECF No. 41 ("Pls.' Suppl. Br."); Def.'s Resp. to Ct.'s Questions, Nov. 12, 2020, ECF No. 39 ("Def.'s Suppl. Br."); Def.-Inter. AHSTAC's Resp. to the Ct.'s Questions for Oral Arg., Nov. 12, 2020, ECF No. 40 ("Def.-Inter.'s Suppl. Br.").

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction over this action pursuant to 28 U.S.C. § 1581(c) and 19 U.S.C. § 1516a(a)(2).  The standard of review in this action is set forth in 19 U.S.C. § 1516a(b)(l)(B)(i): "[t]he court shall hold unlawful any determination, finding or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law."  Id. § 1516a(b)(1)(B)(i).

## DISCUSSION

Plaintiffs challenge Commerce's determination on two bases: (1) whether Commerce adequately considered the difficulties faced by the Elque Group as a small company and provided it sufficient accommodations as required by 1677m(c); and (2) whether, given the totality of the circumstances, Commerce properly applied AFA and justified its selection of a 110.90% AD margin.  Pls.' Br. at 2–4.

First, as a threshold matter, the court must address whether the notice requirement of section 1677m(c)(1) triggers the application of section 1677m(c)(2) or whether those provisions can be applied independently.  The court concludes that section 1677m(c) contains two interrelated provisions, in that clause (c)(1) requires that a party notify Commerce of any difficulties in order

to trigger the applicability of clause (c)(2). Next, the court concludes that the Elque Group did

notify Commerce pursuant to section 1677m(c)(1), and that Commerce did not meet its further

obligations under section 1677m(c)(2). Thus, the court cannot sustain Commerce's application of

AFA.

### I.      Framework and Interaction of Section 1677m(c)

The parties first dispute whether section 1677m(c)(2) is an extension of section

1677m(c)(1), or whether the subsections address separate, independent scenarios. In Commerce's

explanation of its <u>Final Results</u>, Commerce acknowledged that the Elque Group is a small

company and that Commerce provided accommodations, such as questionnaire extensions and

supplemental questionnaires, due to the Elque Group's status and difficulties. IDM at 17. Both

Plaintiffs and the Government agree that the Elque Group participated in the administrative review

as a small company respondent.[3] Pls.' Br. at 12; Def.'s Br. at 17. Nevertheless, the Elque Group

alleges that Commerce failed to provide it additional assistance and consider its difficulties as a

small company as required by section 1677m(c)(2) regardless of any requirement for the Elque

Group to provide notice to Commerce. Pls.' Br. at 12–15. The Government responds that

Commerce both provided assistance to the Elque Group by granting it extensions of time to

respond to original and supplemental questionnaires and considered its status as a small company.

Def.'s Br. at 26–28. However, the Government contends that Commerce appropriately applied

AFA because the Elque Group nevertheless failed to provide requested information and did not

---

[3] AHSTAC contests the Elque Group's claimed status as a small company for purposes of section 1677m(c)(2). Def.-Inter.'s Br. at 21–22. AHSTAC argues that the Elque Group's extensive commentary in its administrative case briefs and in the present proceedings indicate that, despite their failures in the questionnaires, they were in fact competent to navigate agency reviews and could afford counsel to help them do so. <u>Id.</u> at 22. The court does not address these claims because Commerce conceded the Elque Group's status as a small company for purposes of 1677m(c).

specifically alert Commerce to its difficulty in providing responses regarding its Section D Questionnaire.  Def.'s Br. at 21–24, 32–34.[4]  AHSTAC agrees that Commerce was justified in applying AFA because the Elque Group did not notify Commerce of any difficulty in providing responses to the Section D Questionnaire.  Def.-Inter.'s Br. at 24–25.

Section 1677m(c) sets out:

>  (1) <u>Notification by Interested Party</u>.  If an interested party . . . notifies the administering authority or the Commission (as the case may be) that such party is unable to submit the information requested in the requested form and manner, together with a full explanation and suggested alternative forms in which such party is able to submit the information, the administering authority or the Commission (as the case may be) shall consider the ability of the interested party to submit the information in the requested form and manner and may modify such requirements to the extent necessary to avoid imposing an unreasonable burden on that party.

---

[4] Both the Government and AHSTAC claim that the Elque Group did not exhaust administrative remedies for its specific arguments regarding Commerce's obligation to provide additional assistance to small respondents by not raising those arguments in its case brief and by not requesting additional assistance during the review.  Def.'s Br. at 17, 30–31; Def.-Inter.'s Suppl. Br. at 13–14.  While parties are required to exhaust administrative remedies before bringing claims to the court, 28 U.S.C. § 2637(d); 19 C.F.R. § 351.309(c)(2), the Federal Circuit has stated that a party discharges the obligation of exhaustion if the record contains "a 'suggestion' of the argument" and Commerce has the opportunity to address it.  <u>Apex Frozen Foods Priv. Ltd. v. United States</u>, 862 F.3d 1322, 1332 (Fed Cir. 2017) (quoting <u>Ningbo Dafa Chem. Fiber Co. v. United States</u>, 580 F.3d 1247, 1259 (Fed. Cir. 2009)).  Furthermore, parties may introduce "an extension of previously made arguments" before the court.  <u>Solvay Solexis S.p.A. v. United States</u>, 33 CIT 1179, 1183 n.2, 637 F. Supp. 2d 1306, 1309 n.2 (2009).  The Elque Group made more than a mere suggestion of the argument in their case brief, and thus exhausted their remedies before Commerce.  Case Br. at 7–8 (explaining the Elque Group's status as a small company and difficulties it encountered during the review).  The issues that the Elque Group raises in the present proceedings are closely related arguments to the issues raised in the administrative proceedings, and the Elque Group did engage with Commerce on these and related issues during the administrative stages of the review process.  <u>See</u> IDM at 17.  Thus, the Elque Group exhausted administrative remedies and Commerce had an opportunity to address these issues below, and in fact did so.  The Government and AHSTAC make a similar exhaustion argument regarding the Elque Group's arguments about Commerce's selection and application of the AFA dumping margin.  Def.'s Br. at 36; Def.-Inter.'s Br. at 34–35.  For the same reasons, the court finds that the Elque Group satisfactorily exhausted these arguments as well.  <u>See</u> Case Br. at 22–24 (arguing against application of the highest AFA rate).

(2) <u>Assistance to Interested Party.</u>    The administering authority and the Commission shall take into account any difficulties experienced by interested parties, <u>particularly small companies</u>, in supplying information requested by the administering authority or the Commission in connection with investigations and reviews under this subtitle, and shall provide to such interested parties any assistance that is practicable in supplying such information.

19 U.S.C. § 1677m(c)(1)–(2) (emphasis added).

The Elque Group argues that the plain reading of the statute makes clear that Commerce should provide additional assistance to small companies beyond those accommodations that it ordinarily provides larger, veteran respondents.  Pls.' Br. at 13.  The Elque Group contends that this obligation exists even when a small company respondent has not alerted Commerce to any specific issues it encounters in submitting information as contemplated by clause (c)(1).  Pls.' Reply at 8–9.  The Government and AHSTAC, however, argue that every respondent, including small companies, has an affirmative duty to seek specific assistance under section 1677m(c)(1) first, which then triggers Commerce's obligation to provide additional assistance under section 1677m(c)(2).  Def.'s Br. at 26–27; Def.-Inter.'s Br. at 20–21.  AHSTAC further adds that the Statement of Administrative Action ("SAA") of the Uruguay Round Trade Agreements supports this reading by including reference to similar language indicating that clause (c)(1) is a precondition to the application of clause (c)(2).  Def.-Inter.'s Suppl. Br. at 7 (citing Uruguay Round Agreements Act, <u>Statement of Administrative Action</u>, H.R. Doc. No. 103-316, Vol. 1, 656, 864–65 (1994), <u>reprinted in</u> 1994 U.S.C.C.A.N. 4040, 4163).

The court agrees with the Government's and AHSTAC's contention that these subsections are most clearly read as a notification process and subsequent remedy, such that there is (1) a process for <u>any</u> interested party to seek help pursuant to clause (c)(1); and (2) a requirement that Commerce assist those interested parties (particularly small companies) with unique difficulties

pursuant to clause (c)(2).  As noted, under section 1677m(c)(1) respondents are required to alert Commerce to their difficulties, provide an alternate option, and seek assistance.  However, section 1677m(c)(2) can reasonably be interpreted to presuppose that small company respondents need assistance when they encounter difficulties in an investigation or review and that Commerce should "provide any assistance practicable" to those types of respondents.  The court also agrees that the interrelatedness of the provisions can be further inferred from the SAA's discussion of small companies and of clause (c)(1).  See SAA at 865 (noting that where "an interested party promptly notifies the requesting agency that it does not maintain its records in such a medium or language . . . Commerce . . . will not insist on the submission of the data in the requested medium or language" and that this requirement is "intended to alleviate some of the difficulties encountered by small firms").  The court's decision in World Finer Foods, Inc. v. United States, a non-binding, but ultimately persuasive authority, also supports this reading.  24 CIT 541, 543–44 (2000) (analyzing the application of clause (c)(2) after holding that the requirements of clause (c)(1) had been met).

Thus, the court concludes that section 1677m(c) requires that a party notify Commerce of its difficulties providing requested information before Commerce is obligated to provide additional assistance and consideration of a small company's status and difficulties.  The court next turns to whether those requirements were met in this review.

**II.    *Commerce Unlawfully Applied AFA Despite Having Sufficient Notice of the Elque Group's Need for Assistance as a Small Company.***

Having concluded that the Elque Group was required by statute to notify Commerce of its need for assistance, the court must resolve whether the Elque Group's initial request for assistance and subsequent responses provided sufficient notice to Commerce of its difficulties and need for assistance to trigger Commerce's obligations under section 1677m(c)(2).  The court concludes that

the Elque Group did provide that notice, and that Commerce did not fulfill its subsequent obligation of providing additional assistance and consideration to the Elque Group. Therefore, the court concludes that Commerce's application of AFA was unlawful.

### A.    *The Elque Group Adequately Notified Commerce of its Need for Additional Assistance.*

The Elque Group contends that it provided sufficient notice to Commerce of its difficulties as a small company respondent and, specifically, its difficulties in responding to the Section D Questionnaire under the deadlines imposed. Pls.' Br. at 15; Pls.' Suppl. Br. at 7–8. The Elque Group explains that it informed Commerce of "the limitations in its data maintained in the normal course of business" and then "did what it could to convert the information it had access to into a form that matched Commerce's request." Pls.' Suppl. Br. at 8 (citing Suppl. SDQ2 Resp. at Exhs. D-17–D-20; SDQ Resp. at 16). The Government and AHSTAC argue that the Elque Group did not provide adequate notice to Commerce of its need for assistance related to its Section D Questionnaire responses. Def.'s Br. at 26–27, 32; Def.-Inter.'s Br. at 20–21. The Government asserts that the Elque Group requested only general guidance about the review process initially and not about the Section D Questionnaires. Def.'s Br. at 30, 32; Def.'s Suppl. Br. at 7–8. Rather, the Government and AHSTAC argue that the Elque Group merely invited Commerce to follow-up with questions because the Elque Group prepared their reply on a "limited time frame," and did not seek assistance as required under section 1677m(c)(1); therefore, Defendants argue that Commerce was not on notice that the Elque Group needed help as a small business. Def.'s Br. at 32; Def.-Inter.'s Br. at 20.

The record shows that the Elque Group made multiple attempts to notify Commerce of its difficulties throughout the review. First, once the Elque Group was notified that it had been selected as a respondent in Commerce's administrative review, it "contacted Commerce . . . to

obtain guidance about the review process and administrative requirements." IDM at 17. Once the review was underway, Commerce asked the Elque Group for several types of data and information, namely: (1) explanations and documentation showing how information is maintained in its accounting system; (2) explanations of how the reported costs in its questionnaire responses and cost databases were derived; (3) demonstrations of the extent to which its reported costs reasonably reflect cost differences attributable to the physical characteristics contained in its reported CONNUMs; and (4) a complete cost reconciliation and other information necessary for the agency to analyze the Elque Group's reported costs. Id. at 12, 15. Commerce submitted two supplemental Section D questionnaires requesting that the Elque Group's "reported costs [should] reflect [raw material] cost differences for different sizes of input shrimp" with details such as "date of purchase, species, form of purchase, basis of purchase, count sizes, quantities and rate for mix count size." PDM at 9. Commerce also requested that the Elque Group "report cost differences for conversion costs attributable to CONNUMs with different physical characteristics," and that if the Elque Group was unable to provide this that it should use "any reasonable method, such as production time or product yield, to calculate such cost differences." Id. Further, Commerce requested the Elque Group provide "the complete reconciliation of the reported costs to each producing company's normal books and records." Id.

        In responding to each of Commerce's requests, the Elque Group informed Commerce that it received raw materials from suppliers and did not track count-sizes of those materials, nor was it able to meaningfully calculate count-size raw material data from post-production data. Suppl. SDQ1 Resp. at 1–2; Suppl. SDQ2 Resp. at 1. Rather, the Elque Group explained that its data included only average costs of raw materials because it purchased raw shrimp at an average price and only recorded shrimp count-size after the shrimp was processed. SDQ Resp. at 15; Suppl.

SDQ1 Resp. at 1; Suppl. SDQ2 Resp. at 1. The Elque Group provided invoices and explanations to demonstrate their use of data; for example, showing that while it maintained the average count of each lot of raw shrimp, it did not possess size-specific raw material cost data. SDQ Resp. at Exhibit D-45; see also Pls.' Br. at 18. Further, the Elque Group attempted to provide raw material costs by CONNUM by tying the costs to the 'as sold' CONNUMs. SDQ Resp. at 29; see also Pls.' Br. at 19. The Elque Group explained that on the issue of allocating conversion costs among its CONNUMs, it did not perform the large majority of these activities, such as de-heading, peeling, de-veining, and de-tailing; instead, these activities were performed by its raw material suppliers and factored into the raw input cost. Suppl. SDQ1 Resp. at 2; Suppl. SDQ2 Resp. at 3. Additionally, the Elque Group reported that for remaining conversion costs it did not have data for each product with identified physical differences, and that such conversion costs accounted for only seven to two percent of the total cost of production regardless. SDQ Resp. at 15; Pls.' Suppl. Br. at 4 (citing Suppl. SDQ2 Resp. at Exh. D-20). However, the Elque Group notes that nevertheless it provided Commerce with "the requested computer file, including a printout of the file in Exhibit D-20," which the Elque Group claimed consisted of "all unit details for all products produced." Pls.' Post-Arg. Submission, Nov. 19, 2020, ECF No. 43 (quoting SDQ Resp. at 34). Finally, its supplemental responses included a cover letter stating: "[i]f the Department has any further questions regarding this submission, please contact the undersigned," because of tight deadlines for responding. Suppl. SDQ1 Resp.; Suppl. SDQ2 Resp.

The court concludes that the Elque Group satisfied its burden to notify Commerce of its difficulties as a small company respondent under section 1677m(c)(1) and thus Commerce had an obligation to "take into account any difficulties" and "provide . . . any assistance that is practicable in supplying such information" under section 1677m(c)(2). 19 U.S.C. § 1677m(c)(2). The

Government and AHSTAC do not provide adequate justification for why the threshold notification

for assistance is as stringent or formulaic as they suggest.  The court agrees that a standardized

byline in a cover letter offering to answer questions does not serve as a direct request for assistance.

However, when examined together with the Elque Group's fulsome, but ultimately inadequate,

responses to Commerce's questionnaires and explanation of its difficulties it is clear that

Commerce had sufficient notice that the Elque Group was having trouble providing the requested

information and that they needed additional help.  The Elque Group stayed in constant contact

with Commerce, attempted to provide the requested information, explained the information that it

had, and offered to cooperate with Commerce further, including by providing all data and

consenting to on-site verification of its replies.  See IDM at 15–16.  This willingness and attempt

to cooperate in the review, along with the Elque Group's initial notice to Commerce that it was a

small company respondent without previous experience participating in an investigation or review,

was sufficient notice to Commerce of the information it could provide in fulfillment of its section

1677m(c)(1) obligations.

Caselaw cited by the Government and AHSTAC is inapposite because those cases do not

speak to situations in which small company respondents attempted to cooperate with Commerce's

investigations.  See Kawaskai Steel Corp. v. United States, 24 CIT 684, 691–92, 110 F. Supp. 2d

1029, 1036–37 (2000) (rejecting a respondent's attempt to be exempted from answering

questionnaires because of its status as a small company); Kompass Food Trading Int'l v. United

States, 24 CIT 678, 682 (2000) ("Commerce attempted to assist [respondent] . . . . With no response

from Vita forthcoming, further assistance from Commerce was not warranted."); Maverick Tube

Corp. v. United States, 857 F.3d 1353, 1361 (Fed. Cir. 2017) ("Borusan admits it did not provide

the information, and the explanation of its difficulties does not constitute a statement that it was

unable to provide the information."). The Elque Group points to more persuasive caselaw. First, in World Finer Foods, the respondent offered to provide "limited information that Commerce felt might be worthwhile or helpful." 24 CIT at 543–44. The court held that, although the respondent did not offer an alternative form under section 1677m(c)(1), respondent "offered to submit what it could," thus effectively satisfying section 1677m(c)(1)'s requirement to propose a solution and shifted the burden to Commerce to assist as possible. Id. at 544. In a different context, as described in Habas Sinai ve Tibbi Gazlar Istihsal Endustrisi, A.S. v. United States, in its response to Commerce's questionnaires, a party informed Commerce that it did not have requested information. 43 CIT __, __, 361 F. Supp. 3d 1314, 1334–36 (2019). However, Commerce concluded that the respondent provided incomplete information and applied partial AFA. Id. The court then rejected Commerce's application of AFA and found that the respondent had complied with the requirements of section 1677m(c)(1) to promptly notify Commerce of its difficulties when it explained its data limitation shortcomings in its response to questionnaires. Id. Similarly, the Elque Group's questionnaire responses, along with its initial notice to Commerce of its status as small company, first-time respondent, serves as adequate notice of its difficulties in this review. Thus, while each case turns on its own facts, Yama Ribbons & Bows Co. v. United States, 36 CIT 1250, 1253, 865 F. Supp. 2d 1294, 1298 (2012) ("Commerce must base its decisions on the record before it in each investigation"), these facts satisfy clause (c)(1) and the Elque Group's burden to provide a suggested alternative form of submitting information. In the end, the court is not presented with some sort of ethereal epistemological inquiry, but with the realities grounded in the facts of each case. The court recognizes the substantial responsibilities placed on Commerce in every investigation and the importance of cooperation by investigated parties. While a different

case may come out differently, here, Commerce's obligations under clause (c)(2) were triggered such that it was obligated to provide the Elque Group additional assistance.

> **B.    Commerce's Failure to Assist the Elque Group as a Small Company Renders its AFA Determination Unlawful.**

Given that Commerce had notice of the Elque Group's difficulty during the review, the court concludes that Commerce did not adequately assist the Elque Group given its status as a small company. Thus, Commerce's application of AFA in calculating a dumping margin for the Elque Group cannot be sustained.

In the IDM, Commerce noted that "in accordance with section 782(c)(2) of the Act, Commerce takes into account difficulties experienced by parties, particularly small companies." IDM at 17. The IDM then outlines how Commerce provided the Elque Group with accommodations, including "multiple opportunities to provide such information, including in the initial questionnaire and in two supplemental questionnaires, in an attempt to give the Elque Group adequate opportunity to provide such information and to convey the importance of providing this information." Id. Commerce found that the Elque Group failed to provide explanations and supporting calculations, submitted responses with accounting discrepancies, and did not supply adequate cost reconciliations. Id. 12–16. As a result, Commerce determined that it was appropriate to apply AFA because of its determination that the Elque Group did not act to the best of its ability and had a "repeated pattern of not providing information in the form and manner requested" and "offer[ed] little information concerning its cost reporting methodology." Id. at 15. Commerce determined that the Elque Group was not cooperative, despite the Elque Group's argument that it provided all of the information in its possession. Id. Further, Commerce noted that because the Elque Group did not "employ a reasonable method to use available lot-specific count size information to report product-specific costs," it did not act to the best of its ability. Id.

at 16.  Commerce thus applied AFA and calculated a dumping margin for Elque of 110.90%.  Id.
at 19.

The Elque Group argues that Commerce was required to "'take into account any difficulties
experienced by interested parties, particularly small companies, in supplying information
requested,' and to 'provide to such interested parties any assistance that is practicable in supplying
such information.'"  Pls.' Br. at 13 (quoting 19 U.S.C. § 1677m(c)(2)).  The Elque Group asserts
that Commerce did not provide satisfactory assistance and that the extensions Commerce granted
and issuance of a supplemental questionnaire do not constitute adequate assistance as
contemplated by section 1677m(c)(2) because it does not accommodate the Elque Group's status
as a small, first-time respondent.  Id. at 13–14.  Rather, the Elque Group argues that Commerce
afforded it even fewer accommodations than other veteran respondents.  Id. at 14–15 (citing
Mukand, Ltd. v. United States, 767 F. 3d 1300, 1306 (Fed. Cir. 2014) (referencing four
supplemental questionnaires issued); Qingdao Taifa Grp. Co. v. United States, 33 CIT 1090, 1095
& n.3, 637 F. Supp. 2d 1231, 1238 & n.3 (2009) (discussing the fifth supplemental questionnaire
sent to respondent)).

Thus, the Elque Group challenges Commerce's application of facts available with an
adverse inference and asserts that the facts, circumstances, and record evidence do not warrant
Commerce's application of AFA.  Pls.' Br. at 3.  It argues that its repeated efforts to supply the
data available, detailed above, indicated their willingness to cooperate to "the best of its ability,"
which the Federal Circuit has interpreted to mean "one's maximum effort."  Pls.' Br. at 16 (quoting
Nippon Steel Corp., 337 F.3d at 1382).  The Elque Group contends that Commerce misunderstood
its statement that "we maintain in our system the average shrimp count size and the form for each
purchased lot in the production report" to mean that it had information about raw input shrimp

count size.  Pls.' Reply at 15 (citing IDM at 15).  Rather, the Elque Group explains that "by overlooking the phrase 'in the production report' in the just-quoted statement," Commerce erred by concluding that the Elque Group provided inconsistent responses and withheld information.  Id. at 15–16.  The Elque Group maintains that it could not have "concocted a methodology that would utilize the data that actually were available to estimate size-specific shrimp costs with any reasonable degree of accuracy.  In fact, no such reasonable methodology was available -- whether utilizing [Commerce]'s suggestions of using 'production time or product yield' or 'production and purchase records' . . . ."  Id. at 16 (citations omitted).  As a result, the Elque Group argues that it would be improper to conclude that it "failed to cooperate by withholding information if the respondent did not have the information in its possession and it would have been infeasible for the respondent to supply the information."  Pls.' Br. at 16 (citing Tung Fong Indus. Co. v. United States, 28 CIT 459, 476–77, 318 F. Supp. 2d 1321, 1335–36 (2004)).  The Elque Group contends that "[i]n these circumstances, it was unreasonable for [Commerce] to expect the Elque Group -- a small, first-time, pro se respondent -- to develop from scratch a cost reporting methodology that would differentiate insignificant costs in the form and manner requested by [Commerce] without meaningful assistance."  Pls.' Suppl. Br. at 4.  Further, the Elque Group asserts that it is unlawful for Commerce to apply facts available or AFA for failure to provide data that does not exist.  Id. (citing NTN Bearing Corp. of Am. v. United States, 26 CIT 53, 69–70, 186 F. Supp. 2d 1257, 1274 (2002)).

The Government agrees that Commerce needed to account for difficulties that the Elque Group may have experienced as a small company but claims that by providing extensions and requesting supplemental questionnaire responses, it satisfied this statutory requirement.  Def.'s Br. at 15.  The Government points to the IDM in which Commerce stated that it granted the Elque

Group extensions of time in responding to questionnaires and issued two supplemental questionnaires providing the Elque Group additional opportunities to provide information.  Id. at 28–29.  Additionally, the Government claims that Commerce still provided the Elque Group with recommendations on how to more easily submit information, including the option to "use any reasonable method" to report the cost differences for conversion costs.  Id. at 28.  Thus, the Government contends that Commerce lawfully applied AFA.  Id. at 15.  It repeats Commerce's view that the Elque Group could have been more responsive to Commerce's questionnaires and "was still required to provide a reasonable methodology to account for size-specific shrimp cost differences."  Id. at 23 (citations omitted).  AHSTAC takes a similar position and adds that because the Elque Group "does not argue that the information submitted by the company could have been used to calculate an accurate dumping rate[,] . . .  it is undisputed that a gap existed in the record as a result of necessary information not being available."  Def.-Inter.'s Br. at 16.  Thus, AHSTAC claims that "Commerce properly concluded that this gap was the result of the Elque Group's failure to cooperate by not acting to the best of its abilities."  Id.

First, the court agrees with the Elque Group that Commerce did not provide adequate assistance to it as a small company respondent pursuant to section 1677m(c)(2).  Section 1677m(c)(2) requires that Commerce provide "any [practicable] assistance."  19 U.S.C. § 1677m(c)(2).  The court is unpersuaded by the Government's and Commerce's claims that merely treating the Elque Group as it would any other respondent by granting extension requests and providing supplemental questionnaires constitutes any consideration of or provision of additional assistance in light of the Elque Group's status as a small company.  Commerce offered two supplemental questionnaires for the Elque Group and only gave an extension for one of these two questionnaires, which contrasts with cases where parties had several supplemental replies.  IDM

at 17; see, e.g., Mukand, 767 F. 3d at 1306; Qingdao Taifa Grp. Co., 33 CIT at 1095.  While

Commerce has discretion on how it provides extensions and accommodations to any respondent

in its investigations, this discretion does not absolve Commerce of its obligation to provide

additional assistance and consideration to small companies in its investigations.

     More significantly, Commerce did not elaborate on whether its questionnaires were

sufficiently clear in a way that facilitated the Elque Group's responses or "[took] into account any

difficulties experienced" by the Elque Group.  19 U.S.C. § 1677m(c)(2).  Commerce repeated

questions in the questionnaires to indicate that the prior responses were insufficient and simply

requested that the Elque Group use a reasonable method if unable to otherwise answer without

providing any additional guidance or recommendations on how to comply with Commerce's

requests given the Elque Group's data limitations.  IDM at 14–15.  The court fails to see how

repeating the same question or directing respondent to use any reasonable method serves as

assistance to a small respondent.  The court agrees with the Elque Group that "[a] respondent is

not accommodated under Section 1677m(c)(2) merely by being asked the same or similar

questions repeatedly under tight deadlines; rather, it is accommodated by being provided tailored

assistance or modifications of existing questions in light of data limitations, or by [Commerce]

factoring into its decision-making the difficulties faced by the respondent in providing the

requested information."  Pls.' Reply at 10.

     Second, the Elque Group rightly asserts that Commerce's failure to provide the statutorily

required additional assistance in light of its status as a small company bears on Commerce's AFA

decision.  Pls.' Br. at 16.  Commerce's application of AFA relied on unsupported assumptions

about the Elque Group's available data.  While Defendants characterize the Elque Group as

creating a gap in the record with deficient responses, the court rejects this characterization.  The

Elque Group provided proof, in the form of invoices, that it could not comply with requests for

cost-size raw data information, which undermines Commerce's conclusion that the Elque Group

could have complied with requests.  See China Steel Corp. v. United States, 27 CIT 715, 735, 264

F. Supp. 2d 1339, 1360 (2003) ("Commerce's explanation [of AFA application] must include, '[a]t

a minimum,' a determination 'that a respondent could comply, or would have had the capability

of complying if it knowingly did not place itself in a condition where it could not comply.'"

(quoting Nippon Steel Corp., 24 CIT at 1171, 118 F. Supp. 2d at 1378–79)).  The Elque Group

attempted to communicate with Commerce about its difficulties in providing the information

requested, Commerce had an obligation to provide additional assistance as it was on notice that

the Elque Group was a small respondent, but Commerce did not.

        In short, the Elque Group was not required to provide information that it did not have, and

Commerce cannot penalize the Elque Group for providing information it did not possess.[5]  See

Tung Fong Indus. Co., 28 CIT at 459, 318 F. Supp. 2d at 1335–36 (holding that Commerce is not

permitted to require a party to manufacture or rely on a calculation scheme that would result in

inaccurate data).  The court also rejects AHSTAC's contention that, despite any intent to cooperate,

the Elque Group's "incomplete responses are reflective of the type of 'inattentiveness,

carelessness, or inadequate record keeping' that permit the application of adverse inferences by

Commerce in choosing between facts otherwise available."  Def.-Inter.'s Br. at 31 (quoting Nippon

---

[5] The court rejects the Government's attempt to distinguish Tong Fung.  See Def.'s Suppl. Br. at 13.  Furthermore, the court declines to require a respondent to utter magic words informing Commerce of an inability to provide specific information, as the Government seems to request, when review of the Elque Group's responses clearly indicates that they did not have the ability to provide the information as requested.  See Def.'s Br. at 34 ("Again, not only did the Elque Group not provide the information, but 'the explanation of its difficulties does not constitute a statement that it was unable to provide the information.'" (first quoting Suppl. SDQ Resp. at 2 then quoting Maverick Tube Corp., 857 F.3d at 1361)).

Steel Corp., 337 F.3d at 1383).  As the Federal Circuit stated in Nippon Steel, "[t]he focus of [the AFA provision] is respondent's failure to cooperate to the best of its ability, not its failure to provide requested information."  337 F.3d at 1381 (emphasis omitted).  This conclusion is again supported by the court's earlier opinion, World Finer Foods.  There, the court relied on section 1677m(c)(2) to demonstrate and emphasize Commerce's obligation to help small companies, especially after a respondent offered to provide any data it had available.  World Finer Foods, Inc., 24 CIT at 544.  Commerce there failed to provide any avenue to avoid an adverse inference, and the court reasoned that, had the parties known about alternate avenues, respondents presumably would have complied.  Id. at 544–45.  Thus, the court rejected Commerce's application of AFA. Id. at 545.

In sum, the court concludes that Commerce did not provide adequate assistance to the Elque Group as a small, first-time mandatory respondent.  Thus, Commerce's decision to treat the Elque Group as an uncooperative respondent and apply AFA cannot be upheld.  The court remands its determination to Commerce so that it may reconsider its decision.[6]  On remand, Commerce may reopen the record in order to provide further assistance to Calcutta in procuring the requested information.  Shandong Rongxin Imp. & Exp. Co., 203 F. Supp. 3d at 1337 ("The [c]ourt may remand with instructions for Commerce to decide whether to reopen and supplement the record, in order to obtain necessary information or resolve ambiguities, per its discretion." (citing Essar Steel Ltd. v. United States, 678 F.3d 1268, 1278 (Fed. Cir. 2012))); see also Fresh Garlic Producers Ass'n v. United States, 40 CIT __, __, 190 F. Supp. 3d 1302, 1306 (2016) ("Commerce generally may reopen the administrative record on remand.").  The court leaves to Commerce the

---

[6] Because the court remands Commerce's application of AFA, it need not further address Plaintiffs' challenge to Commerce's selection of the AFA rate.

determination of whether, for example, an application of neutral facts available would remedy Elque Group's further need for assistance in this review.

## CONCLUSION

The court finds that Commerce was sufficiently on notice of the difficulties that the Elque Group had as a small company because (1) the Elque Group explained and offered to provide all available data and (2) the Elque Group was unable to provide reasonably effective or accurate calculations for conversion cost. Commerce was thus statutorily obligated to provide further assistance under section 1677m(c)(2) and applicable caselaw, yet it did not and instead applied AFA. For the foregoing reasons, Commerce's Final Results are remanded for a decision in accordance with this opinion. Commerce shall file with this court and provide to the parties its remand results within ninety (90) days of the date of this order; thereafter, the parties shall have thirty (30) days to submit briefs addressing the revised final determination to the court, and the parties shall have fifteen (15) days thereafter to file reply briefs with the court.

**SO ORDERED**.

/s/  *Gary S. Katzmann*
Gary S. Katzmann, Judge

Dated: February 3, 2021
New York, New York